**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA ADAMCZAK and REBECCA WOOTEN, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>PUPBOX, INC.,<br><br>　　　　　　　　Defendant. | Case No. 2:20-cv-10299<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Tamara Adamczak and Rebecca Wooten (collectively "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant PupBox, Inc. ("PupBox" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. PupBox is a monthly subscription service that provides toys, treats and training guides customized for puppies that change as the puppy grows older. PupBox was featured on Season 8 of the popular television show, *Shark Tank*, where the company struck a deal with one of the "Sharks."

2. Between February 11, 2020 and August 9, 2020, PupBox was the subject of a data breach due to its negligent failure to properly safeguard the information of its customers. The data breach exposed the names, email addresses, addresses, credit card numbers, credit card expiration dates, credit card CVV codes, and Pupbox.com passwords (collectively, the "personal identification information" or "PII") of PupBox customers.[1]

3. Plaintiffs bring this class action on behalf of themselves and all others similarly situated for actual and statutory damages, as well as punitive damages and equitable relief to fully redress the widespread harm PupBox's wrongful acts and omissions have unleashed.

## THE PARTIES

4. Plaintiff Tamara Adamczak resides in Clark County, Nevada and intends to remain there, and so is a domiciliary of Nevada. Ms. Adamczak has been a Pupbox customer since June 2020, and pays approximately $35 a month for her

---

[1] NOTICE OF DATA BREACH, https://oag.ca.gov/system/files/Experian_F8590_L02_PupBox_CA%20Template.docx_SAS_PROOF_Rev1.pdf.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

membership. As part of her PupBox membership, Ms. Adamczak entrusted her PII, including her credit card information, to Defendant. When entrusting her PII to Defendant, Ms. Adamczak reasonably believed that her PII would be securely stored and protected against unauthorized access. In fact, Defendant represented in its Privacy Policy that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers." In or about October 2020, Ms. Adamczak received a letter from Defendant informing her that her PII—including her name, email address, address, and credit card information—was accessed and extracted in the data breach. Ms. Adamczak now faces a substantial and imminent risk of fraud, identity theft, and long-term adverse effects as a result of her PII being compromised.

5. Plaintiff Rebecca Wooten resides in Hamilton County, Tennessee and intends to remain there, and so is a domiciliary of Tennessee. Ms. Wooten has been a PupBox customer since April 2020, and pays approximately $35 a month for her membership. As part of her PupBox membership, Ms. Wooten entrusted her PII, including her credit card information, to Defendant. When entrusting her PII to Defendant, Ms. Wooten reasonably believed that her PII would be securely stored and protected against unauthorized access. In fact, Defendant represented in its Privacy Policy that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers." In or about October 2020, Ms. Wooten received a letter from Defendant informing her that her PII—including her name, email address, address, and credit card information—was accessed and extracted in the data breach. Ms. Wooten now faces a substantial and imminent risk of fraud, identity theft, and long-term adverse effects as a result of her PII being compromised.

6. Defendant PupBox, Inc. is a Delaware corporation with a principal place of business at 4060 Terrace Court, San Diego, California 92116. PupBox does substantial business in the State of California and throughout the United States.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 members of the Class, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in California.

9. Venue is proper in this District because, pursuant to PupBox's Terms of Service, the parties have consented to this District as the proper venue for this action.[2]

**FACTUAL ALLEGATIONS**

**I. BACKGROUND ON DATA BREACHES**

10. A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so.[3]

11. A data breach can occur in numerous ways. One way that a data breach can occur, and most relevant to this action, is through skimming. Skimming occurs when "thieves steal payment data directly from the consumer's payment card or from

---

[2] PUPBOX TERMS OF SERVICE, https://pupbox.com/tos/ ("Any dispute relating in any way to your visit to our website or to products or services sold or distributed by PupBox in which the aggregate total claim for relief sought on behalf of one or more parties exceeds $7,500 shall be adjudicated in any state or federal court in the County of Los Angeles in the State of California, and you consent to exclusive jurisdiction and venue in such courts.").

[3] Julian De Groot, *The History of Data Breaches*, DIGITAL GUARDIAN (Oct. 24, 2019), https://digitalguardian.com/blog/history-data-breaches.

the payment infrastructure at a merchant location."[4]  Skimming can also occur when an unauthorized user inserts a virtual credit card skimmer or scraper (known as "formjacking") into a web application (such as the shopping card) in order to scrape or steal credit card information.  This information can then be used to make fraudulent purchases, or sold for profit to other criminals.[5]  This method of skimming is the *modus operati* of a criminal hacker group called "Magecart."[6]

12. The purpose of skimming "is to commit fraud."  "[T]he threat is serious, and it can hit any merchant's environment."[7]  The PII of Plaintiff and class members are certain to be used for nefarious purposes.

13. Data breaches are becoming increasingly more common and harmful. In 2014, 783 data breaches were reported, with at least 85.61 million total records exposed.[8]  In 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.[9]  The average cost of a data breach in the United States in 2019 was $8.19 million.[10]

14. Consumers are harmed in a variety of ways by data breaches.  First, consumers are harmed financially.  According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer

---

[4] PCI SECURITY STANDARDS COUNCIL, SKIMMING PREVENTION OVERVIEW OF BEST PRACTICES FOR MERCHANTS (2009), https://www.pcisecuritystandards.org/documents/skimming_prevention_overview_one_sheet.pdf.

[5] Tara Seals, *Magecart Hits 80 Major eCommerce Sites in Card-Skimming Bonanza*, THREATPOST, Aug. 28, 2019, https://threatpost.com/magecart-ecommerce-card-skimming-bonanza/147765/.

[6] *Id*.

[7] PCI SECURITY STANDARDS COUNCIL, SKIMMING PREVENTION OVERVIEW OF BEST PRACTICES FOR MERCHANTS.

[8] Julian De Groot, *The History of Data Breaches*.

[9] Dan Rafter, *2019 Data Breaches: 4 Billion Records Breached So Far*, NORTON BY SYMANTEC, https://us.norton.com/internetsecurity-emerging-threats-2019-data-breaches.html.

[10] Chris Brook, *What's the Cost of a Data Breach in 2019*, DIGITAL GUARDIAN (July 30, 2019), *https*://digitalguardian.com/blog/whats-cost-data-breach-2019.

was $150 per record.[11]  However, other estimates have placed the costs even higher.  The 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of data breaches—was $298 dollars.[12]  And in 2019, Javelin Strategy & Research compiled consumer complaints from the U.S. Federal Trade Commission ("FTC") and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[13]

15. Identity theft is one of the most problematic harms resulting from a data breach.  With access to an individual's PII, criminals can do more than just empty a victim's bank account – they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture.  In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name.  Identity thieves may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[14]

16. Consumers are also harmed by the time they spend rectifying the effects of a data breach.  A Presidential identity theft report from 2007 states that:

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for

---

[11] *Id.*

[12] NORTON BY SYMANTEC, 2013 NORTON REPORT 8 (2013), https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

[13] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

[14] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED        5

future inaccuracies, close existing bank accounts, open new ones, and dispute charges with individual creditors.[15]

17. Further, the effects of a data breach on consumers are not temporary. In a report issued by the U.S. Government Accountability Office ("GAO"), the GAO found that "stolen data may be held for up to a year or more before being used to commit identity theft," and "fraudulent use of [stolen information] may continue for years" after the stolen information is posted on the Internet.[16] In fact, consumers suffer 33% of the harm from a data breach after the first year.[17] Thus, consumers can lose <u>years'</u> worth of time dealing with a data breach.

## II. THE PUPBOX DATA BREACH

18. Between February 11, 2020 and August 9, 2020, PupBox was the subject of a data breach.

19. Upon information and belief, the data breach was conducted through a prolonged, Magecart-style skimming attack on PupBox's website. In other words, hackers implanted virtual software (*i.e.*, the "unauthorized plugin" mentioned in PupBox's notice of data breach) on the checkout pages of PupBox's website, which allowed the unauthorized third party to acquire a copy of the PII entered by customers on PupBox's website.

20. PupBox first became aware of the data breach on August 7, 2020, when PupBox "received a notification that fraudulent activities may have occurred on

---

[15] U.S. FEDERAL TRADE COMMISSION, THE PRESIDENT'S IDENTITY THEFT TASK FORCE, COMBATING IDENTITY THEFT: A STRATEGIC PLAN 11 (2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf.

[16] *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (citing U.S. GOV'T ACCOUNTABILITY OFFICE, GAO–07–737, REPORT TO CONGRESSIONAL REQUESTERS: PERSONAL INFORMATION (2007)).

[17] Larry Ponemon, *What's New in the 2019 Cost of a Data Breach Report*, SECURITY INTELLIGENCE, https://securityintelligence.com/posts/whats-new-in-the-2019-cost-of-a-data-breach-report/.

credit cards that were used on the PupBox website."[18]  PupBox confirmed the data breach on September 2, 2020, which revealed that the data breach exposed the names, email addresses, addresses, credit card numbers, credit card expiration dates, credit card CVV codes, and Pupbox.com passwords (collectively, the "personal identification information" or "PII") of PupBox customers.

21. PupBox began mailing out letters to affected individuals in October 2020.  Upon information and belief, as of the date of this Complaint, not all individuals have received their notice letter of the data breach.

22. The data breach affected individuals across the United States.

23. None of the individuals whose PII was accessed, authorized such access or extraction.

24. PupBox represents in its Privacy Policy that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers."[19]  Despite this representation, PupBox failed to take reasonable measures to protect the personal information of Plaintiffs and members of the Class, included the following:

    (a) Failing to maintain appropriate technological and other systems to prevent unauthorized access.  Despite PupBox's claim that it takes "certain … technical steps" to protect sensitive data, PupBox's system was still subject to a data breach.  Indeed, upon information and belief, PupBox failed to encrypt customer PII on its checkout page, which allowed the data breach to occur.

    (b) Failing to recognize the data breach in a timely manner.  Despite PupBox's claim that it takes "certain physical, administrative, and technical steps" to protect sensitive data, PupBox failed to detect the

---

[18] NOTICE OF DATA BREACH.
[19] PUPBOX PRIVACY POLICY, https://pupbox.com/tos/.

skimming attack until August 7, 2020, almost six months after it occurred. Had PupBox been more diligent in surveying its systems, the data breach would not have occurred, or PupBox would have caught the data breach earlier and minimized the extent of the data breach.

25. PupBox has, to date, not offered a remedy to individual consumers who were affected by the data breach, such as compensation for lost time or fraudulent charges, or free advanced credit monitoring.

26. Pursuant to PupBox's Terms of Service, California law applies to all individuals in the putative Class.[20]

27. Plaintiffs bring this action on behalf of themselves, the Class, and the Subclass for actual and statutory damages, as well as punitive damages for: (i) negligence, (ii) negligent misrepresentation, (iii) negligence per se for violation of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, (iv) breach of contract, and (v) violation of the California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.

## CLASS ACTION ALLEGATIONS

28. Plaintiffs seek to represent a class defined as all persons or business entities in the United States whose PII was maintained on the servers of PupBox that were compromised as a result of the data breach (the "Class"). Excluded from the Class are Defendant, its affiliates, employees other than those affected by the data breach, officers and directors, and the Judge(s) assigned to this case.

---

[20] PUPBOX TERMS OF SERVICE, https://pupbox.com/tos/ ("By visiting our website, you agree that the laws of the State of California, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and PupBox.").

29. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

30. At this time, Plaintiffs do not know the exact number of members of the Class. However, given the nature of the claims and the size of Defendant's business, Plaintiffs believe that the members of the Class are so numerous that joinder of all members is impracticable.

31. Common questions of law and fact exist as to all members of the Class. The data breach was generally applicable to all members of the Class and arose from a common set of acts and omissions by Defendant without regard to the nature or identity of individual members of the Class, thereby making appropriate relief with respect to the Class as a whole.

32. The questions of law and fact common to the Class include:

    (a) Whether Defendant owed a duty to the members of the Class under federal or state law to protect the PII, provide timely notice of the unauthorized access, provide timely and accurate information as to the extent of the compromised PII, and provide meaningful and fair redress;

    (b) Whether Defendant breached such a duty;

    (c) Whether Defendant's breach provided the means for the data breach;

    (d) Whether Defendant was negligent in failing to design, employ, and maintain adequate security systems and protocols;

    (e) Whether Defendant's negligence provided the means for the data breach;

    (f) Whether Defendant knew or reasonably should have known of the vulnerabilities in its systems that allowed for the unauthorized access;

     (g)    Whether Defendant falsely represented that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers";

     (h)    The appropriate injunctive and related equitable relief for the Class; and

     (i)    The appropriate class-wide measure of damages for the Class.

33. Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendant's wrongful conduct in that their PII has been exposed to criminal third parties without their authorization.

34. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

35. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

36. Plaintiffs are represented by counsel competent and experienced in the prosecution of consumer protection and tort litigation.

37. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages. Further, California law applies to all putative Class members pursuant to PupBox's Terms of Service, which further diminishes any individuality between putative Class members.

38. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense of numerous individual actions. The benefits of proceeding as a class, including providing injured persons or entities with a method

for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

39. The prosecution of separate actions by individual members of the Class is not feasible and would create a risk of inconsistent or varying adjudications.

## COUNT I
### Negligence

40. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

41. Plaintiffs bring this claim on behalf of themselves and all members of the proposed Class against Defendant.

42. Defendant had and continues to have a duty to Plaintiffs and members of the Class to safeguard and protect their PII. Defendant created this duty by requiring Plaintiffs and members of the Class to provide their PII, storing the PII, using the PII for commercial gain, and making representations in its Privacy Policy that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers."

43. Defendant's duty required it, among other things, to design and employ cybersecurity systems, anti-hacking technologies, intrusion detection and reporting systems sufficient to protect the PII from unauthorized access and to promptly alert Defendant to any such access and enable it to determine the extent of any compromised PII.

44. Had Defendant adequately designed, employed, and maintained appropriate technological and other systems, the PII would not have been compromised or, at a minimum, Defendant would have known of the unauthorized access sooner and would be able to accurately inform Plaintiffs and Class members of the extent to which their PII has been compromised.

45. Defendant breached its duties of care by, among other things, failing to maintain appropriate technological and other systems to prevent unauthorized access,

failing to minimize the PII that any intrusion could compromise, and failing to detect the data breach in a timely manner to avoid or minimize the effects of the data breach.

46. Defendant's breach of its duties provided the means for third parties to access, obtain, and misuse the PII of Plaintiffs and Class members without authorization. It was reasonably foreseeable that such breaches would expose the PII to criminals and other unauthorized users.

47. Defendant's breach of its duties has directly and proximately injured Plaintiffs and Class members, including by foreseeably causing them to expend time and resources investigating the extent to which their PII has been compromised, taking reasonable steps to minimize the extent to which the breach puts their credit, reputation, and finances at risk, and taking reasonable steps (now or in the future) to redress fraud, identity theft, and similarly foreseeable consequences of unauthorized and criminal access to their PII.

48. Plaintiffs and Class members are entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief.

## COUNT II
### Negligent Misrepresentation

49. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

50. Plaintiffs bring this claim on behalf of themselves and all members of the proposed Class against Defendant.

51. Defendant represented in its Privacy Policy that it takes "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers."

52. These representations were for the express purpose of protecting Plaintiffs' and Class members' PII, and created an affirmative duty to take "certain

physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers."

53. Defendant made these representations in the ordinary course of its regular business with the intent to induce Plaintiffs and Class members to supply their PII to Defendant for the purposes of using Defendant's service.

54. Defendant knew that Plaintiffs and Class members would rely on the above-referenced representations in supplying their PII to Defendant for the purposes of using Defendant's service.

55. Plaintiffs and Class members justifiably relied on Defendant's representations regarding the security of their PII in choosing to provide their PII to Defendant.

56. Defendant violated these representations by failing to use reasonable measures to secure the PII of Plaintiffs and Class members. Specifically, Defendant failed to maintain appropriate technological and other systems to prevent unauthorized access, failed to minimize the PII that any intrusion could compromise, and failed to detect the data breach in a timely manner to avoid or minimize the effects of the data breach.

57. It was reasonably foreseeable in that Defendant knew or should have known that its failure to implement reasonable measures to protect the PII of Plaintiffs and Class members would result in the data breach of such information.

58. The release and disclosure of Plaintiffs' and Class members' PII to third parties was without Plaintiffs' and Class members' authorization or consent.

59. Defendant's breach of its duties has directly and proximately injured Plaintiffs and members of the Class, including by foreseeably causing them to expend time and resources investigating the extent to which their PII has been compromised, taking reasonable steps to minimize the extent to which the breach puts their credit, reputation, and finances at risk, and taking reasonable steps (now or

in the future) to redress fraud, identity theft, and similarly foreseeable consequences of unauthorized and criminal access to their PII.

## COUNT III
### Negligence *Per Se* For Violation of the Federal Trade Commission Act, 15 U.S.C. § 45

60. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

61. Plaintiffs bring this claim on behalf of themselves and all members of the proposed Class against Defendant.

62. Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce." The FTC has held that the failure to employ reasonable measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5.

63. The FTC has provided guidance on how businesses should protect against data breaches, including: protect the personal customer information they acquire; properly dispose of personal information that is not necessary to maintain; encrypt information stored on computer networks; understand their network's vulnerabilities; and install vendor-approved updates to address those vulnerabilities. FTC guidance also recommends that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone may be trying to penetrate the system; and watch for large amounts of data being transmitted from the system.

64. Plaintiffs and members of the Class are within the class of persons Section 5 of the FTCA was intended to protect.

65. The harm that has occurred is the type of harm the FTCA was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses that, as a result of their failure to employ reasonable data security

measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and members of the Class.

66. Defendant owed a duty to Plaintiffs and members of the Class under Section 5 of the FTCA.

67. Defendant breached its duty under Section 5 of the FTCA by, among other things, failing to maintain appropriate technological and other systems to prevent unauthorized access, failing to minimize the PII that any intrusion could compromise, and failing to detect the data breach in a timely manner to avoid or minimize the effects of the data breach.

68. Defendant's breach of its duties has directly and proximately injured Plaintiffs and Class members, including by foreseeably causing them to expend time and resources investigating the extent to which their PII has been compromised, taking reasonable steps to minimize the extent to which the breach puts their credit, reputation, and finances at risk, and taking reasonable steps (now or in the future) to redress fraud, identity theft, and similarly foreseeable consequences of unauthorized and criminal access to their PII.

69. Plantiffs and the members of the Class are entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief.

## COUNT IV
### Breach of Contract

70. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

71. Plaintiffs bring this claim on behalf of themselves and all members of the proposed Class against Defendant.

72. Defendant entered into contracts with Plaintiffs and Class members to provide access to its services.

73. These contracts included or otherwise incorporated Defendant's Privacy Policy, in which Defendant represented that it takes "certain physical, administrative,

and technical steps designed to safeguard the personal information we collect from and about our customers."

74. Defendant has breached these contracts by failing to take "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers," including by failing to maintain appropriate technological and other systems to prevent unauthorized access, failing to minimize the PII that any intrusion could compromise, and failing to detect the data breach in a timely manner to avoid or minimize the effects of the data breach.

75. Plaintiffs and Class members have suffered damages as a result of Defendant's breach, including through identity theft and expenses incurred combating identity theft.

## COUNT V
### Violation Of California's Unfair Competition Law, California Business & Professional Code §§ 17200, *et seq.*

76. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

77. Plaintiffs bring this claim on behalf of themselves and all members of the proposed Class against Defendant.

78. By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to the Class, by engaging in unlawful and unfair conduct.

79. Defendant's acts and practices described above also the UCL's proscription against engaging in unfair conduct.

80. Defendant representing that it took "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers" to induce customers to supply their PII to Defendant, yet failed to take said measures to protect the PII, which resulted in the data breach.

Further, Defendant has not provided a remedy to Plaintiff and Class members for the effects of the data breach.

81. Plaintiffs and Class members conferred a financial benefit on Defendant by providing Defendant with their PII in connection with their use of Defendant's service. Plaintiffs and Class members were then deprived of the benefit of their bargain with Defendant because Defendant failed to take "certain physical, administrative, and technical steps designed to safeguard the personal information we collect from and about our customers," which led to the data breach and caused Plaintiffs and Class members to suffer a diminution in the value of their PII, lost time and expenses dealing with the effects of the data breach, and put Plaintiffs and Class members at risk for future harm such as identity theft.

82. As a direct and proximate result of Defendant's unfair practices, Plaintiffs and Class members were deprived of their benefit of the bargain with Defendant and have suffered substantial injury in fact, and lost money and/or property. The injuries suffered by Plaintiffs and Class members include, but are not limited to, diminution in the value of their PII, lost time and expenses dealing with the effects of the data breach, and being at greater risk for future harm such as identity theft.

83. By committing negligence, negligent misrepresentation, negligence per se, and breach of contract, Defendant has also violated the UCL's proscription against unlawful conduct.

84. Pursuant to California Business and Professional Code § 17203, Plaintiffs and the Class seek an order of this Court that includes, but is not limited to, an order requiring Defendants to: (a) provide restitution to Plaintiffs and the other Class members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' and the Class' attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) An Order certifying each of the proposed Class and appointing Plaintiffs and their Counsel to represent the Class;

(b) An Order requiring Defendant to implement better procedures and security for the protection of Plaintiffs' and the Class members' PII;

(c) An Order compelling Defendant to employ and maintain appropriate systems and policies to protect consumer PII and to promptly detect, and timely and accurately report, any unauthorized access to that data;

(d) An award of compensatory and punitive damages, in an amount to be determined;

(e) An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law;

(f) Interest on all amounts awarded, as allowed by law; and

(g) Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: November 10, 2020            **BURSOR & FISHER, P.A**.

By: */s/ L. Timothy Fisher*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiffs*